**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| RASTISLAV SIPKO, | : | |
| Petitioner, | : | Civ. No. 23-2835 (KM) |
| v. | : | **OPINION** |
| ANTHONY CURETON, et al., | : | |
| Respondents. | : | |

**KEVIN MCNULTY, U.S.D.J.**

I.   **INTRODUCTION**

Petitioner Rastislav Sipko ("Ras")[1] seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. DE 1. He challenges his detention in Bergen County Jail in Hackensack, New Jersey, pursuant to a commitment order for civil contempt entered by the Superior Court of New Jersey, Chancery Division, General Equity Part, Bergen County. *Id.* at 1. The contempt order arises out of Ras's failure to satisfy a 2016 state court $24 million judgment in favor of his twin brother, Robert, which was affirmed by the New Jersey Supreme Court in 2022. The state courts determined that, in an attempt to avoid the judgment, Ras has secreted money overseas and encumbered assets. To date, a balance of $6 million remains outstanding and Ras has been continuously detained for 19 months. For the reasons below, the petition is denied and a certificate of appealability shall not issue.

---

[1] The family members in this case and the underlying state court matter—Rastislav Sipko, Robert Sipko, and George Sipko—have the same last name. To distinguish them, I use their first names, consistent with the parties' briefs and the state court opinions.

## II.     BACKGROUND

### A.  Factual Background[2] and Procedural History

#### 1.   The Superior Court Judgment and Ras's Secreted and Encumbered Assets

In 2007, following a falling-out among family members, Robert commenced a shareholder oppression suit related to a software development business, Koger, Inc. ("Koger"), which had been founded by Ras and Robert's father, George Sipko. *Sipko v. Koger, Inc.*, 214 N.J. 364, 367 (2013). On July 27, 2016, following a remand from the New Jersey Supreme Court, the Superior Court entered judgment, awarding Robert an $18 million buyout, plus interest, of his interests in two companies related to Koger—Koger Distributed Solutions, Inc. ("KDS"), and Koger Professional Services, Inc. ("KPS").[3] *Sipko v. Koger, Inc.*, 251 N.J. 162, 166–67 (2022); DE 16-3 at 4. The trial court held that a buyout of Robert's interests in KDS and KPS—valued as of the date the oppression suit was commenced—was an appropriate remedy in light of "the court's finding that George and [Ras] deliberately stripped the companies of value for the specific purpose of putting the money beyond Robert's reach." *Sipko*, 251 N.J. at 167. Given this finding, the court "imposed a constructive trust on Koger's profits and enjoined George, Ras, and Koger from transferring any assets until full satisfaction of the judgment or the posting of an appropriate bond." *Sipko*, 251 N.J. at 171, 173.

As explained by the New Jersey Supreme Court in 2022, in addition to stripping the companies of their value, Ras and George also engaged in a variety of bad-faith post-judgment and post-remand actions, likewise designed to keep their assets out of Robert's reach:

---

[2] Pursuant to 28 U.S.C. § 2254(e)(1), this Court affords deference to the factual determinations of the State court.

[3] Ras, George, and the companies were held to be jointly and severally liable. DE 16-4 at 11.

After the trial court entered its judgment in favor of Robert, defendants' pattern of acts calculated to prevent Robert from obtaining compensation for his interests in KDS and KPS continued. Post-judgment, George and Ras claimed, without documentary support, that they were unable to post a bond. They filed an application to post alternative security, supported by their certifications offering their combined 98.5 percent interest in Koger. Further, Ras offered to post $3 million in cash and real property in Connecticut that he valued at $6.75 million.

On September 30, 2016, the trial court entered an order granting the posting of the alternative security, conditioned upon George and Ras providing a sworn accounting of both foreign and domestic assets and liabilities. The order provided that if the court found any material misrepresentation in the sworn accounting, it would forfeit defendants' posted cash, deed, and stock in partial satisfaction of the judgment and vacate the stay of execution of the judgment. The court also ordered George and Ras to provide "audited financial statements within 100 days," and enjoined them from encumbering, secreting, or transferring any assets outside the ordinary course of business.

On November 7, 2016, the court granted Robert's request to appoint a special fiscal agent (SFA) to oversee Koger. The judge also ordered and required George and Ras to file, within thirty days, a sworn accounting of transactions by Koger that exceeded $50,000, and of any transactions by George or Ras that exceeded $10,000, from September 30, 2015 to November 30, 2016.

The accounting of transactions filed with the SFA on January 13, 2017 was telling. It revealed that Ras "drew down $2.5 million on his credit line, exhausting the line, days after the post-remand decision." Defendants also revealed, apparently for the first time in December 2016, that they owned real estate in Slovakia that their appraiser valued at approximately $23 million. Robert asserted that he was completely unaware of the three newly disclosed properties and that his appraisers in Slovakia valued the land as worth a total of approximately $3.1 to $4.3 million.

Most shockingly, the sworn accounting revealed that George and Ras, while representing to the court for months that they did not have money with which to post a bond, had transferred approximately $20 million in cash to overseas accounts in a series of transactions between July 28, 2016 (one day after the judge

issued his decision awarding $18 million to Robert) and August 11, 2016 (approximately one week before entry of the judgment).[4]

At a hearing, George and Ras claimed that they sent the money overseas to pay off a debt to a relative who supposedly had lent them $17 million to purchase several properties in Slovakia—the same properties that defendants first disclosed to the court and Robert in December 2016. According to defendants, the loan became due in August 2016 and it was entirely coincidental that they needed to begin paying off the debt and transferring millions of dollars to Slovakia the day after the trial court's ruling in favor of Robert. The trial court found that the transfers totaling approximately $20 million in supposed repayment of the loan were not made to the alleged holder of the note, but rather were sent to George's sister and nephew, and to the wife or daughter of George's brother-in-law. Although they claimed they owed a significant amount of money on the loan, defendants provided no evidence to the court of any loan documents or evidence of the money they spent to acquire the properties and no evidence whatsoever of the claimed significant financial transactions related to the $20 million.

The court concluded that defendants' claim of a loan payoff was a fabrication, "simply a made up story to camouflage a desperate effort to secrete assets overseas to family members to shield those monies from Robert and his lawyers." The court further found that "the reason $20M [in] U.S. dollars fled this country for Slovakia, secretly distributed to these overseas relatives, was because George and Ras panicked in the face of the $18M award in favor of Robert against them, and were desperate to get the money out of the country and beyond his reach."

In an order dated July 3, 2018, the trial court held that George and Ras were in violation of litigant's rights and directed defendants to return $18 million by July 16, 2018. If the defendants failed to return the money by that date, they were to appear in court on July 19 to be remanded to the Bergen County jail to serve each weekend until the money was returned. As of July 19, 2018, the money was not returned. Ras appeared to commence his commitment, but George absconded the

---

[4] Of the $20 million, it appears that Ras transferred $3 million. DE 2-6 at 2, ¶ 2 (Certification of Rastislav Sipko: "On August 9, 2016, I wired a total of $3 million to Slovakia.").

country. The trial court issued a warrant for George's arrest, but he continues . . .
to be a fugitive from the court.[5]

*Sipko*, 251 N.J. at 173–76 (footnotes omitted).

In affirming, the New Jersey Supreme Court rejected Ras's argument that "post-judgment and post-remand conduct should not be considered in determining whether equity requires the application of a marketability discount" to the trial court's valuation of Robert's interests in KDS and KPS at the time the suit commenced. *Sipko*, 251 N.J. at 187. Specifically:

> Just as the trial court noted, we cannot "ignore the reality that steps were knowingly taken to deplete the value of assets Robert was asserting one-half interest in." Defendants' bad-faith behavior throughout this 15-year litigation occurred for the specific and obvious purpose of preventing Robert from being fairly compensated for his interests. Defendants now ask the Court, after acting unfairly at almost every turn, to apply a doctrine rooted in fairness to relieve them of their responsibility to buyout Robert for the amount determined by the trial court. We decline to do so. If ever there was an instance in which equity <u>did not</u> fall in a party's favor, it is this case.

*Id.* (emphasis in original).

## 2.  The Connecticut Assets

In his application to post alternative security, Ras had offered the Connecticut property as alternative security, "stating that he was 'ready and willing to pledge [the] real property.'" *Sipko*, 251 N.J. at 173. However, "shortly thereafter, without notice to the court, Ras obtained an attachment order in his Connecticut divorce proceeding which made that property part of the assets to be distributed in the divorce and, therefore, beyond the trial court's reach." *Id.*; *see also* DE 16-4 at 13 (the New Jersey trial court noted that "Ras attach[ed] the house in undisclosed

---

[5] Robert moved to dismiss George's appeal of the judgment based on the fugitive disentitlement doctrine, "citing the trial court's conclusion that George fled the jurisdiction after secretly diverting assets overseas to frustrate Robert's ability to collect on the judgment and the court's threat of imprisonment unless the assets were returned." *Sipko*, 251 N.J. at 176. The Appellate Division granted Robert's motion, so George was not a party to the appeal. *Id.*

divorce proceedings that were not known to th[e] Court, preventing it from being sold"). "After several years of proceedings, a Connecticut court ordered the sale of the property with 65 percent of the sale price to be disbursed to satisfy any unpaid balance of the judgment in favor of Robert." *Id.* The Connecticut court also ordered up to 65% of the net proceeds of accounts at Morgan Stanley worth approximately $200,000 and accounts at Merrill Lynch worth more than $1 million to be disbursed to satisfy any unpaid balance of the New Jersey judgment. DE 2-20 (Connecticut memorandum decision) at 46–49.

Ras is appealing the divorce judgment, seeking a reversal of all financial orders and a new trial. DE 16-35 (Ras's brief filed with the Connecticut Appellate Court) at 6 (arguing the Connecticut appellate court "should reverse and remand for a new trial on all financial orders"). Additionally, in an application pending in Connecticut, Ras filed a motion that seeks an order allowing him to "transfer $118,195 from the Merrill Lynch investment account #4490 and/or Merrill Lynch investment account #5170 to Plaintiff [his ex-wife, Kristyna], in satisfaction of the alimony and child support arrearage accrued from the date of judgment [May 5, 2022] through present, plus the payment due April 1, 2023"). DE 16-36 (motion for order post-judgment).

### 3.  Commitment Proceedings

After the state court found that Ras and George had secreted $20 million overseas, Robert filed a motion in aid of litigant's rights, seeking "to compel George and Ras to return the monies wired overseas and to incarcerate them until they complied." DE 16-3 at 11 (July 3, 2018 decision following evidentiary hearing). The state court permitted discovery and then held a plenary hearing over seven days, in which Ras was represented by counsel. *Id.* at 2–3. At issue was "whether George and Ras Sipko's transfer overseas of $20M immediately upon receipt of an

$18M award against them was to repay a bona-fide antecedent debt (as they claim) or whether the transfers were made to avoid or defeat enforcement of the award against them." *Id.* at 3.

In a 22-page decision rendered on July 3, 2018, the court found, "beyond any reasonable doubt," that "there was no bona-fide antecedent debt" and "the monies were wired overseas to put them beyond the immediate reach of" Robert. *Id.*; *see also id.* at 20 ("The reason $20M in U.S. dollars fled this country for Slovakia, secretly distributed to these overseas relatives, was because George and Ras panicked in the face of the $18M award in favor of Robert against them, and were desperate to get the money out of the country and beyond his reach."). Thus, George and Ras were found to have violated Robert's rights. *Id.* at 23. As a remedy, the Court ordered George and Ras to "return the sum of $18M by July 16, 2018," and if they failed to do so, they would be "remanded to the Bergen County jail to serve weekends" until the money was returned. *Id*.

George left the country and Ras failed to return the funds; he instead reported to jail almost every weekend for more than a year—with several stays while the parties litigated applications Ras filed to purportedly secure the judgment with a loan.[6] *See, e.g.*, DE 16-4 at 13–14 (1/3/2020 opinion denying Ras's application to secure the judgment with a loan). Robert thereafter moved to have Ras committed full-time until he complied.

On January 6, 2020, the state court—now with a different judge presiding—granted Robert's motion, stating:

> I've given a lot of thought to what should be done. In looking at all of this I think there should be an opportunity to bring that money back by coercive means and at least part of that money that [Ras] willfully sent out of the country.

---

[6] During one of those reprieves, Ras apparently traveled internationally using an undisclosed Slovakian passport in violation of restraints, resulting in sanctions. DE 40 at 2–3 (January 21, 2021 order requiring Ras to turn over to counsel "all passports in his possession or that come into his possession in the future" and awarding Robert attorneys' fees and costs).

> So my order is going to be that I'm going to order full-time incarceration but I'm going to stay that until March the 6th, and if the money comes back obviously any orders will be vacated. If it doesn't and some of it comes back, I'll consider restoring it to the weekends . . . .
>
> . . .
>
> . . . I have no desire to see Ras incarcerated on a full-time basis. It's a lot of money we're talking about. And it was sent to family and it could be retrieved from family. . . .
>
> But I wanted to give him a fair opportunity to be able to show a good faith effort to him attempting to rectify the violations of the orders in the past and to alleviate, whether it be full-time incarceration or any incarceration at all.

DE 16-5 at 6 (January 6, 2020 transcript of proceedings). In an order dated January 22, 2020,[7] the state court (1) remanded Ras "on a full-time basis to the Bergen County Jail until such time as he complies with Paragraph 3 of the Court's July 3, 2018 Order requiring the return of $18 million in funds," and (2) stayed the order until March 6, 2020. DE 2-9 at 3.

Ras did not return the funds by the deadline and was remanded to the Bergen County Jail "until such time as he shall comply with the court's Orders to return the $18 million from overseas or until further order of the court." DE 2-10 (March 6, 2020 order).

Ras was released on March 23, 2020, pursuant to a stay due to the onset of COVID-19. DE 2-11 (3/23/2020 order: "Due to the dangers posed by Coronavirus disease 19 . . . and in the spirit of the Order of the New Jersey Supreme Court filed March 22, 2020, [Ras] will be immediately released from the Bergen County Jail.").

---

[7] Ras's appeal of this commitment order was dismissed for failure to file required transcripts after he was granted multiple extensions to do so. DE 16-41 (June 21, 2021 Appellate Division order: "The transcripts still have not been ordered and counsel's certification indicates that appellant intends to await disposition of this motion. Only then has appellant committed to 'order' the transcripts. The court refuses to reinstate the appeal after appellant has refused to comply with an order entered four months ago. Appellant's conduct since entry of the court's February order shall not be condoned.").

Two years later, on March 11, 2022, the state court, on Robert's motion, ordered Ras

back to jail, though did not require him to report to jail until April 1, 2022, to allow him time to

seek a stay from the Appellate Division. DE 2-12 (3/11/2022 transcript); DE 2-13 at 3–4

(3/21/2022 order vacating the stay of Ras's civil commitment, and directing that Ras "shall

appear at the Bergen County Jail on April 1, 2022 . . . to be remanded on a full-time basis to the

Bergen County Jail until such time as he complies with Paragraph 3 of the Court's July 3, 2018

Order requiring the return of $18 million in funds or until further order of the Court"). In

ordering Ras's return to jail, the court stated:

> Basically, again, the argument that is being made is that [George and Ras] had the
> right to do this, they did it, they just happened to send $20 million overseas to pay
> a loan off to relatives after they got hit with a massive judgment, and after they
> lied to the Court about posting a bond . . . .
>
> So I guess lawyers get to lie, litigants get to lie. You know, we didn't all start
> doing this today.
>
> And I . . . give Judge Contillo[, the previous presiding judge] a lot of credit,
> because I don't think I would have had that plenary hearing. But he had it.
>
> And he put the burden on Robert. And, you know, we didn't all fall off the
> pumpkin truck, and if you are going to tell me, Mr. Cohen[, counsel for Ras], with
> a straight face -- and I know it is your client and I am just saying this rhetorically -
> - that they just decided in their representations to Judge Contillo and the
> representations in Connecticut, and the transferring of the money overseas, that it
> was to pay off relatives as opposed to trying to avoid this judgment, then I don't
> know what to say.
>
> But I don't buy it. Judge Contillo didn't buy it. And I wasn't the one who made
> the findings.
>
> But you get hit with a judgment, you make representations, and then you transfer
> this money.
>
> . . .
>
> The only thing I am focusing on is not Connecticut, it is not constructive trusts, it
> is not anything other than the fact of what happened when this money was
> secreted.
>
> And that can't happen.

. . .

So as a result of all this, I think my words that were spoken back on March 23, 2020, it has been two years, and I did proceed with caution, I did do, over opposition, release him.

But I can't now allow all of that to become an excuse to circumvent and skirt the secreting of this money and the transfer of this money overseas not only in violation to, you know, everything that, you know, we hope our system stands for, but also the caveat that the Courts offered that at least let's bring back some of it so we can put this issue to rest.

But nothing with regard to this one narrow issue has changed since then.

So the only thing we are really discussing is the whole situation with COVID.

So as a result of this, I am going to order that he be re-incarcerated full time, recommitted as a coercive means for this money that was transferred out, and being in contempt.

. . .

. . . [I]f circumstances change and there is some sort of breakthrough in terms of whether it is with the $3 million or any other property that can be committed, I wouldn't hesitate to reconsider this order.

But he will be committed to the Bergen County Jail to coerce compliance with the Court's order and previous orders . . . .

DE 2-13 at 51–58.

On March 23, 2022, Ras sought permission to file an emergent stay motion with the

Appellate Division of that order. DE 16-11. The Appellate Division granted permission (DE 16-

12), but denied a stay on March 31, 2022, explaining:

Movant seeks a stay of a March 21, 2022 order vacating a stay of a previous civil coercive incarceration order designed to secure compliance with a prior order by the trial court to return funds to satisfy an outstanding judgment. To obtain a stay of a trial court order, the movant must demonstrate that absent the stay, he would suffer irreparable harm, his claim rests on settled law, there is a reasonable probability of success on the merits, and the relative hardships favor a stay. *Garden State Equality v. Dow*, 216 N.J. 314, 320 (2013). Movant has not met that burden. In particular, movant has not demonstrated a reasonable probability of success. … At this stage of the litigation, the trial court's March 21, 2022 order appears to be grounded in a reasoned exercise of discretion. Therefore, the motion for a stay is denied.

DE 2-15. The New Jersey Supreme Court then denied a stay on April 1, 2022. DE 2-16. Ras reported to jail that day.

On May 20, 2022, Ras moved in the Appellate Division (DE 16-15) to (1) terminate his commitment on the grounds of changed circumstances given that (a) the approximate balance on the judgment at that point was "slightly more than $7 million" (*id.* at 15) and (b) the Connecticut court's May 5, 2022 judgment (DE 2-20) ordering that 65% of the Connecticut property and two brokerage accounts be held in escrow for Robert would result in "approximately $8.25 million" being held in escrow for Robert's benefit (DE 16-15 at 15), or (2) in the alternative, for a remand (a) for reconsideration of his commitment based on the Connecticut decision or (b) to conduct a hearing concerning his alleged inability to repatriate funds to satisfy the judgment (*id.* at 10 (Ras's brief to the Appellate Division: Ras has "maintain[ed] that he has no ability to return the [f]unds" sent overseas), 20 ("Ras has always maintained that he cannot repatriate the [f]unds because he does not control them"), 21 (arguing that "Ras should be granted an opportunity to prove to the trial court that he has no ability to repatriate the [f]unds to satisfy the July 3rd Order")). The Appellate Division granted the motion in part on June 23, 2022, remanding to the trial court "for further consideration of the commitment in light of the current status of the Connecticut proceedings." DE 2-17 at 2.

At oral argument on remand, the state court reiterated that Ras "has been incarcerated coercively pending return of monies that have been secreted overseas." DE 16-20 at 4. Counsel for Robert reminded the court that "during prior conferences," the court "agreed that [counsel for Ras] would have the ability to argue" both "ability to pay and the recent developments in Connecticut." *Id.* at 5. Counsel for Ras then argued that the commitment order should be terminated because (1) "[a]ll of the assets here in the States have been liquidated" (*id.*); (2) "Ras

has already represented that he does not intend to appeal any of the rulings that were in Robert's favor as far as the 65 percent goes" (*id.*); (3) 65% of the investment accounts and the alleged value of the Connecticut home "would take care of the balance of the judgment," thus "Robert is secured for if not the entire amount of the judgment, depending on what the house is sold for, the vast majority of the remaining balance of the judgment" (*id.* at 6); and (4) Ras has no ability to bring the money back from overseas (*id.* at 8–9). Counsel for Robert responded, *inter alia*, (1) Ras "has never certified that he can't bring the money back" (*id.* at 15); and, (2) as to the Connecticut matter, an automatic stay was entered pending Ras's appeal of the Connecticut judgment; Ras has refused to consent to lift the stay so the house can be sold; a $9 million cash offer for the house was rejected; the house is in disrepair; Ras has not paid insurance on it; and taxes have gone unpaid (*id.* at 17–18).

In furtherance of Ras's argument that he cannot bring the money back, Ras's lawyer and the court engaged in the following exchange:

> THE COURT: . . . I'm not convinced that the money can't be brought back. The money doesn't want to be brought back. He spent millions of dollars in fees. I mean, do you want to give me a certification as to how much all of this has cost? And then, you know, and then of course it will be it didn't come from him, but you know, if it's on his behalf, then he has the ability to access funds.
>
> MR. COHEN [counsel for Ras]: With all due respect, --
>
> THE COURT: I didn't start doing this yesterday.
>
> MR. COHEN: Judge, I'm not implying otherwise. What I'm here to argue before your honor is that he does not have the ability to bring this money --
>
> . . .
>
> It is well known that every time we get together with Your Honor, Your Honor always says show me something. Just show me something, Ras. I'll let you out of here, I've got to see something though. I'm not -- I don't want to put you in jail for this. You've got to show me something. And it's undisputed that Your Honor has made certain remarks and implied even if he only brought back 3 million, which we --

THE COURT: I've said that.

MR. COHEN: -- you know, that he was responsible for, that might be enough to do it. And despite every time that you've said it, he's done nothing. All right. Undisputed.

The question before Your Honor, and what we're here to argue is – the only issues before Your Honor today is (A) is Ras able to bring the money back that was sent overseas six years ago, -- the majority of which was sent by his father – and simply refuses to do so at every opportunity, or does he not have the ability to bring it back? That's what we're here to argue today. And we're asking your honor to address that question in light of all the circumstances that have occurred during the six years up to today in assessing whether he truly has the ability to bring that money back.

This is what he's lost, Judge. He's lost his marriage. He's lost his kids. He's lost his livelihood. He was once making over $1 million. He lost his family business, which was appraised between [$]30 and $50 million. He's lost his marital home. He's lost his life savings. He's lost the brokerage accounts. He's lost a condo in New Jersey. He lost his car. He's had millions of dollars in additional fees assessed against him for sanctions and attorney's fees.

THE COURT: So he's the victim?

MR. COHEN: No, he's not a victim. I'm not saying he's a victim.

THE COURT: He had no role in any of it?

MR. COHEN: I'm not saying –

THE COURT: All right.

MR. COHEN: -- he didn't have a role, but what I'm saying is if somebody holds the key to prevent those kinds of losses from occurring, why would they not use that key? Who in their -- who in this courtroom if they had the actual ability to bring $3 million back and not lose their marriage, their kids, their livelihood, the family business, and everything that I rattled off, who in their right mind would incur that kind of loss with the key in their pocket? It doesn't make any sense, Judge.

And most importantly, he's lost his freedom now. He sits here in handcuffs with five sheriff officers in the room before Your Honor. He has served a year in jail between the weekends and the last six months full time. He's been in jail for a year. Basically -- and -- and there's been Covid outbreaks. I've been in that jail when there have been lockdowns. I've been refused access to visit him when there have been riots. He's not on a vacation, Judge.

> And -- and our argument today is that he would never have incurred these kinds of losses, he still could not be sitting in jail if he had the ability to bring back the money. That's what he's in jail for. Now, everything turns to we need to keep him in jail until the Connecticut house is sold. That's not the standard. That's not the issues before this Court. He knows that he can't show you something, Judge. He has always steadfastly taken the position that he has no way of bringing that money back.

DE 16-20 at 8–9; *see also id.* at 11 (counsel for Ras: "He has now spent an entire year of his life being incarcerated . . . He has literally lost everything. He currently has nothing left, and he has no time with his young children. . . . [w]ho incurs that when they have the key in their pocket? It's -- I just -- I don't even know how much longer in anyone's eyes, or how much more he has to lose for people to be convinced he doesn't have the ability to bring the money back. What more can he lose? There's nothing left to lose. How much more time is enough time for people to believe he can't bring it back?").

The court rejected these arguments and denied the motion to terminate his commitment, reasoning as follows:

> This Court has expressed repeatedly, and you know, after 17 years on the bench and albeit a substantial part of that, about six and a half years in the Criminal Division, but I've spent both in the Family Division and now doing civil matters. I've never incarcerated somebody before. I -- I'm not one to, you know, hold people in contempt or sanction or -- you know, that's not my first instinct at all. This was just a situation that -- we've said from the beginning that just can't be tolerated or condoned. And the way it happened would just bring our entire system, you know, into a situation that nobody wants to be in where, you know, you lie to courts, you move money, and you know, it has a long history. We know that. And although that's part of it, the secreting of the money happened in 2016. The case dates back to '07, and it's had a continual aspect to it, which is to do everything possible to thwart this judgment, and it hasn't gone well.

> And now you're saying well, they recovered all this money, but it's been a long road. It's been a long process. It's been -- and it continues. That's the thing. When I say show me something, look, I didn't insert all of these Connecticut issues. The -- there's things going on in Connecticut, a divorce case, which involved assets which could involve money that could satisfy the judgment. Now, the Appellate Court said in light of what's going on in Connecticut, so it kind of brings the two issues together, but I am not making any rulings about Connecticut.

It's your right to appeal in Connecticut. It's Kristyna's as well. And if you want to appeal some issues, all the issues, you have the right to do that and I certainly would never interfere with that, but the Connecticut assets are a way of circumventing and not bringing that other money back.

And you know, perhaps we thought -- and I'm sure Robert's attorneys thought that maybe we could do something with that. And I said right away I don't feel good about him being incarcerated. Let's see if we could resolve this. I'm not going to get into settlement discussions, but there [were] indications that you know, that Robert would be reasonable on certain issues. It seemed that we could get pretty close. I would think Kristyna needs money to live. She's going to come into at least, you know, hopefully, you know, a couple million dollars or more. But again, we're nowhere. We have a house [in Connecticut] that's in disrepair. I'm hearing that, you know, trees are about to come down, taxes haven't been paid. How do you have no insurance on a $9 million house? You know?

Show me something. And it makes no sense. It's just a continuation. And I don't know, you know, what's going on, but there's been a lot of money spent on this case. I'm hearing new lawyers are hired, but I should just bury my head in the sand, and that's not you, that's your mother. Well, your mother has all this money or maybe your father does, or maybe it's your money? I don't know. It's not my business, but I'm being asked to believe that you can fund all these law firms -- and I can only imagine what it amounts to, in probably Connecticut alone, not to mention we just had, you know, the round that we had with the hedge fund and the McElroy firm coming in.

And this is a by-product of secreting this money overseas by lying to a court. So what is this Court supposed to do? Say you know what, hire all these attorneys, challenge everything, you know, he just doesn't have any money to bring back so you should just believe that. Let him out because when Ras gets out, he'll do all the right things. But all I see is a continuation of the same things. …

. . . You've done everything possible to thwart collecting this judgment, and that's your right. And so now this Court is left with a coercive confinement. Can he bring back this 3 million? I honestly believe he can. I really do. And if you can't, well then you better get with the people who are controlling the money because you know, maybe they hate Robert more than they care about you. I don't know. And it's not my business either, but I'm having trouble believing that you have access to all these funds, but not when it comes to satisfying this judgment.

So I think the money can come back. …

… So I'm going to deny the application. I'd be happy to consider it again when, you know, there's reason to consider it. …

. . .

> So, you know, again Connecticut is an offshoot and the Appellate Division said
> we could consider parts of that . . . . Maybe you'll be successful on your appeal.
> There will be a whole new trial [in Connecticut] and you're going to --you know,
> we don't know what's going to happen, but you know, and it's -- then that's kind
> of off the table and we've got to go back to bring the money back. And it's, you
> know, -- so I'm going to deny it and at the appropriate time, certainly I'll be
> happy to reconsider it.

DE 16-20 at 21–24.

On October 13, 2022, the court entered an order memorializing the denial of Ras's

motion to terminate his commitment. DE 16-21. Ras's appeal then returned to the Appellate

Division, where he amended his notice of appeal to include the trial court's October 13, 2022

order denying his application for release. DE 16-22 at 6 (amended notice of appeal). Ras filed his

merits appeal brief on November 9, 2022, and corrected deficiencies two weeks later. DE 16-22

at 7 (amended brief: "Ras has always maintained an *inability* to repatriate the funds in

compliance with the trial court order, *not an unwillingness* to do so. The circumstantial evidence

here—namely, the devastation of Ras's life and extensive deprivation of his freedom—

demonstrate that he simply cannot comply. Clearly, if he actually held the key to his freedom, he

would have used it to avoid being homeless, jobless, divorced, and now estranged from his

young children.") (emphasis in original).

However, after retaining new counsel, on January 4, 2023, Ras again moved for release in

the trial court (DE 2-23 (notice of motion)); and on January 6, 2023, he withdrew his appeal of

the trial court's March 21, 2022, and October 13, 2022 orders (DE 16-24 (stipulation of dismissal

of appeal)). In support of his January 4, 2023 application for release, Ras submitted a

certification to the trial court that included the following representations: "On August 9, 2016, I

wired a total of $3,000,000 to Slovakia" and "I do not have control over those funds today" (DE

2-6 at ¶ 2); "I do not have the ability to repay the $3 million that was wired to Slovakia in July

2016" (*id.* ¶ 12); I have approached my father, George, and asked that he gift or loan me $3

16

million to satisfy a portion of the judgment in this action" and "George has refused" (*id.* ¶ 13); outside of the encumbered Connecticut assets and property in Slovakia co-owned with George, "I have no other assets to repay funds to Robert" (*id.* ¶ 12); and "I have no unencumbered assets in the United States or Slovakia" (*id.* ¶ 16).

Two weeks after Ras certified that he had "no other assets"—on January 17, 2023—a Slovakian public marshal—an individual appointed by the Slovakian courts in connection with execution proceedings initiated by Robert in 2022—identified and froze bank accounts owned by Ras in Slovakia worth more than $2 million. DE 16-25. On January 29, 2023, Robert filed his opposition to Ras's motion, wherein he advised the court of Ras's previously undisclosed Slovakian account. DE 16-26.

On January 31, 2023, two days after Robert filed his opposition brief revealing the existence of Ras's $2 million held overseas, Ras executed a power of attorney from jail authorizing a lawyer in Slovakia to oppose the execution process. DE 16-28 (power of attorney); DE 16-29 (motion to terminate the execution). Ras's Slovakian lawyer submitted briefing in Slovakia (1) arguing that the New Jersey judgment is invalid, and (2) implying that, in any event, the judgment has been satisfied. DE 16-29 at 15–19 (translation of motion to terminate the execution: Robert liquidated "all assets of the [defendant companies], . . . the total value of which, including shares on the trade market, exceeded USD 60 million").

In Ras's February 1, 2023 reply brief in further support of his application for release, he acknowledged the "newly uncovered Slovakian accounts," and argued that he should nonetheless be released because Robert "will be paid in full." DE 16-27 at 2. Specifically, he asserts that "[t]hrough Ras's actions in the Connecticut proceedings" (a motion for the release of the 65% of the funds in the brokerage accounts), funds from the Connecticut home ("recent orders from the

Connecticut court require the home to be repaired and listed"), and the Slovakian accounts, "all $8.2 million of the judgment will be satisfied." *Id*. at 2–5. Thus, Ras argued, "there is nothing to coerce; the judgment will be satisfied." *Id.* at 7. At a hearing on his application on February 24, Ras testified he has no other assets beyond the assets that were disclosed in the Connecticut proceeding and the newly discovered Slovakian bank account. DE 2-25 at 5–6.

At the conclusion of the hearing on Ras's motion, the trial court denied the motion, finding that that Ras's testimony that were no other assets was not credible:

> I have been an attorney and a judge for I think 37 years now. . . . I have never seen a case like this where it is just one lie after another. Including in these very proceedings.
>
> And it is just dismissed by counsel like it is no big deal and let's just focus on what [Ras] is saying now.
>
> And you know, I am not going to go through the history of lies, but I have said on this record repeatedly, the very first one, I mean, you know, it is just appalling that our system -- if every litigant did what [Ras and George] did, we wouldn't have a [c]ourt system.
>
> And beginning with the $20 million going overseas and then lying about what it was used for and having a trial about what was done.
>
> Now he is representing to this Court that properties are worth a million. Well, you have proof of that?
>
> When he is saying they purchased it for 20 million, Mr. Stein [counsel for Robert] is suggesting it was 4.88 million.
>
> Well, maybe you should look into that and present to the Court what they were really purchased for. And I don't think it was probably 20 million.
>
> And if you think so, then go get the information, because that might be yet another lie.
>
> So this application is filed, briefs are submitted, and an account is discovered that he lied about.
>
> But now there are no other accounts. Well, you know what? I am not so sure about that.

And when I say show me something, then get with the lawyers over there where everything is withdrawn and we are trying to claw back that money.

Expedite it where there is no further proceedings where they have access to that money.

Let's see the house get listed. . . . I have been hearing about that for months.

And I don't know if there are any other accounts, but I guess that has to be looked into. But the point, is, once again, an application was brought before this Court for [Ras] to get out of jail, and it was just one big lie about, I have no assets.

Did he say that to the Court or not? Did you submit papers to this Court that he has no asserts? Well, he lied.

So now I am supposed to believe that he has no assets when I am sure George is paying you, he paid millions of dollars to other attorneys, and my concern, is, this is coercive.

I want Ras to get out. I really do. I want the lies to stop.

I didn't start doing this yesterday and neither did you, and you should be ashamed of what was presented to this Court, honestly, which was just a bold face lie.

And I don't believe any of it at this point. I want to see what is going on in Slovakia, I want -- the burden is on him to show that they are not opposing things.

There is no doubt in my mind there has been a continuation of obstruction and opposition throughout this case, whether it came to selling the business . . . . Whatever was represented.

And Mr. Cohen did a fine job for a long time. It is just a continuation of the same.

So he gets out and he is going to make it his business to make sure all these things happen so the judgment gets paid?

Well, then let's see it. . . .

. . . That would be something, if you show that, you know, he is no longer opposing the $2 million.

. . .

I don't think in seventeen years on the [b]ench I have ever even held somebody in contempt, much less incarcerate them. That is to the degree of misrepresentations that have been made to this court, much less to the previous judges.

And you bring an application, and within this application is another bold face lie which he gets caught. Why? Why is it that -- it makes no sense to me.

. . .

And then they come and it is a -- it really is a sad situation, and I want him to be out. I just can't do it on the record that has been created here. It would be wrong.

And when you say that, you know, this Court has somehow kept him in jail, it has been appealed numerous times. It has been affirmed.

. . .

And it is a situation that hopefully will never be repeated, and it is a situation that hopefully will be corrected. So go to work and correct it.

DE 2-25 at 106–10.

The court then provided the following guidance:

You say, well, what does he have to do? Well, let's see what is happening in Slovakia. Let's get the Connecticut stuff going. Give me a good explanation and let's get -- maybe get the attorneys on from Connecticut.

Why is [Kristyna] all of a sudden -- I mean, . . . Did she get any money? No, she didn't get any money. All right. Well, maybe we should bring her and put her under oath.

But all I've heard, is -- from Ras Sipko, and this proceeding was based on another house of cards, another lie; that he has no assets when he in fact had assets, when he is going to cooperate where, you know, there was a power of attorney in Slovakia where, you know, there is an attempt to claw back, which really hasn't been refuted.

The only thing that was said was, I don't really know what the lawyers are doing, which I don't accept that.

So find out what the lawyers are doing and then educate the Court, and I will reopen this hearing.

But for now the application is denied.

. . . I know there is the issue of financial records. Perhaps you could work something out with that.

That would be a start. Agreeing that he is going to disclose the financial information. Why wouldn't he do that? . . . I mean, I think there was tax returns.

Does he have anything in Slovakia? The bank statements. Everyone does online banking now.

He's got this woman who is the power of attorney. You could go in ten minutes. .
. . You could sit down, you could look at the accounts and see what was in there.

. . . But none of that is being done.

So when I see more, I will be happy to revisit it. . . .

*Id.* at 110–11.

On March 20, 2023, Ras moved for reconsideration, arguing that the application should

be granted because during a March 15, 2023 hearing in the Connecticut divorce proceedings, the

Connecticut court "made clear that: (a) the Greenwich Connecticut home will be listed for sale in

short order, (b) Kristyna Sipko is not delaying the sale of the Connecticut home, and (c) Robert

Sipko will receive 65% of all Connecticut assets." DE 16-31 at 3. Robert opposed the motion.

DE 16-32.

On May 12, 2023, the court denied the motion for reconsideration, reasoning as follows:

I am happy to hear that the property got listed . . . .

. . . [I]f it gets under contract and it is going to close and the judgment is going to
get – as soon as money comes up that is his that can be applied to this judgment,
whether it comes from Slovakia, whether it comes from, you know, some account
that nobody knows about, whether it comes from the house, I want to get him out.

But what do I have to do it with? I had – this is a reconsideration of a previous
application which I don't think you can deny he is lying to the Court once again,
and certainly not for the first time.

And then we have George lurking out there. Somebody is paying all these fees.

Either he is paying them and he has money, or somebody else is paying them.

If you want to make a fuller picture, if you want to disclose all that, you want to –
but, you know, the Court is in the dark.

So I am just supposed to believe this is it, he has no more money.

But you know what? I don't believe it. So it is coercive. He did [perjure] himself.

And, you know, even if I don't apply the reconsideration standards . . . that it is
palpably incorrect, or irrational, I didn't consider everything, I think with this
record that is – I don't think that standard is even close to being met.

21

> I don't think it was palpably incorrect or irrational. How can it be palpably incorrect or irrational when there were matters pending and he submits a false certification?
>
> And, you know, he just makes matters worse all the time. And nobody can figure it out. Like what is he thinking? What is he doing? Like, why is he doing it? Why didn't he bring the $2 million?
>
> Now I am hearing he is still trying to claw it back in Slovakia. You are saying he is not.
>
> I said last time, then show me. I even said, let's get the Slovakian attorney on the big screen, maybe we can work it out.
>
> But we don't even know for sure what is happening over there.
>
> So, you know, I am glad there seems to be some movement, but, you know, let him bring something back.
>
> And I said – and it you're saying he doesn't have it, then, you know, I am not prepared at this point to accept that.
>
> So I am going to deny the application.

DE 2-28 at 39–41.

On August 21, 2023, the court entered an order directing UniCredit Bank—the Slovakian bank where Ras's uncovered account is located—to produce to Ras "all bank statements" from the "account opening through present." DE 19-1 at 5. However, it appears that the statements have not been produced. *See* DE 19-1 at 19 (trial court on August 30, 2023: "[W]e don't know what is happening in Slovakia. . . . [W]hat are these bank accounts? We can't get them, we don't have those."); *see also* DE 19 (Ras does not represent in his September 15, 2023 reply brief in support of his habeas petition that the statements have been produced; rather, he asserts that he "entered into a consent order for his statements to be released").

### B. The Habeas Petition

Ras filed his habeas petition on May 24, 2023. DE 1. He challenges the trial court's July 19, 2019, and March 21, 2022 commitment orders (*id.* at 2), arguing that his commitment has

become punitive and therefore violates his due process rights under the Fifth and Fourteenth Amendments (*id.* at 6). Ras conceded that he did not exhaust these claims by appealing in the state court system, but argues that "exhaustion would be futile," and "the appellate process and the unique circumstances of this case render the state court process ineffective." *Id.* at 8. He seeks immediate release. *Id.* Robert answered on July 31, 2023 (DE 16), arguing that Ras's petition should be denied because he failed to exhaust (DE 16-47 at 27–36), and because the state court's application of federal law was not objectively unreasonable (*id.* at 36–44). Ras replied on September 15, 2023. DE 19. The matter is therefore fully submitted and ready for decision. For the reasons below, the petition is denied and a certificate of appealability shall not issue.

## III.    LEGAL STANDARD

### A.  Standard of Review

The district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A habeas petitioner must establish entitlement to relief for each claim in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *Parker v. Matthews*, 567 U.S. 37, 40–41 (2012). District courts must be "highly deferential" to the determinations of state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 773 (2010).

If the state courts have adjudicated a claim on the merits, the district court shall not grant a writ of habeas corpus unless that adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Federal law is "clearly established" for these purposes if it is clearly expressed in "the holdings, as opposed to the dicta" of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). If a petitioner challenges an allegedly erroneous state court factual determination, that determination "shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### B.  Exhaustion

A federal court may not grant a writ under § 2254 unless the petitioner has first "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A); *see also Rose v. Lundy*, 455 U.S. 509, 515 (1982); *Henderson v. Frank*, 155 F.3d 159, 164 (3d Cir. 1998); *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997). The petitioner must afford the state courts "the opportunity to resolve the federal constitutional issues before he goes to the federal court for habeas relief." *Id.* (quoting *Zicarelli v. Gray*, 543 F.2d 466, 472 (3d Cir. 1976)). Exhaustion also permits development of a complete factual record in state court, which aids federal court review. *See Lundy*, 455 U.S. at 519.

To exhaust, a petitioner must "'fairly present' all federal claims to the highest state court before bringing them in federal court." *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007) (citing *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir. 2002)). "Fair presentation means that a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." *Rainey v.*

*Varner*, 603 F.3d 189, 198 (3d Cir. 2010) (citations and internal quotation marks omitted). "[T]he claims heard by the state courts must be the 'substantial equivalent' of claims asserted in the federal habeas petition. Reliance on the same constitutional provision is not sufficient; the legal theory and factual basis must also be the same." *Massey v. Warren*, No. CV 13-3439, 2018 WL 6649723, at *3–5 (D.N.J. Dec. 19, 2018) (citing *Picard v. Connor*, 404 U.S. 270 275, 277 (1971)); *see also McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999) ("It is not sufficient that a 'somewhat similar state-law claim was made.'") (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982)). "A petitioner can 'fairly present' his claim through: (a) reliance on pertinent federal cases; (b) reliance on state cases employing constitutional analysis in like fact situations; (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution; and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *Nara v. Frank*, 488 F.3d 187, 198 (3d Cir. 2007).

The exhaustion doctrine therefore requires a petitioner to have fairly presented each federal ground that is raised in the § 2254 petition to all levels of the New Jersey courts. *Prall v. Att'y Gen. of the State of N.J.*, No. 18-2614, 2021 WL 733685, at *5 (D.N.J. Feb. 25, 2021) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); *Lundy*, 455 U.S. at 509). "The burden is on the habeas petitioner to prove exhaustion." *DeFoy v. McCullough*, 393 F.3d 439, 442 (3d Cir. 2005).

Generally, district courts should dismiss petitions containing unexhausted claims in the absence of a state court decision clearly precluding further relief, even if it is not likely that a state court will consider the claims on the merits. *See Lundy*, 455 U.S. at 522; *Banks v. Horn*, 126 F.3d 206, 212–14 (3d Cir. 1997). However, when a petitioner's constitutional claims are unexhausted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See*

*Carrascosa v. McGuire*, 520 F.3d 249, 254–55 (3d Cir. 2008) ("Section 2254(b)(2) provides that '[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.' The District Court was thus well within its discretion to deny Carrascosa's unexhausted claim on the merits") (quoting 28 U.S.C. § 2254(b)(2)); *Taylor v. Horn,* 504 F.3d 416, 427 (3d Cir. 2007) ("[B]ecause we will deny all . . . claims on the merits, we need not address exhaustion.").

## IV.   DISCUSSION

### A.  Applicable Law

"There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966) (citations omitted). "[C]ivil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994); *Turner v. Rogers*, 564 U.S. 431, 442 (2011) ("where civil contempt is at issue, the Fourteenth Amendment's Due Process Clause allows a state to provide fewer procedural protections than in a criminal case"). This lesser level of process suffices because "the contemnor is able to purge the contempt and obtain his release by committing an affirmative act"; he "thus 'carries the keys of his prison in his own pocket.'" *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 442 (1911); *see also Turner*, 564 U.S. at 441–42 ("once a civil contemnor complies with the underlying order, he is purged of the contempt and is free").

A court's discretion regarding confinement under an order of civil contempt is not unfettered, however. When incarceration for civil contempt becomes punitive, "due process

considerations oblige a court to release a contemnor from civil contempt." *Simkin v. United States*, 715 F.2d 34, 37 (2d Cir. 1983). Civil confinement becomes punitive when it can no longer secure compliance. *See, e.g.*, *Hicks v. Feiock*, 485 U.S. 624, 638 n.9 (1988) ("Punishment may not be imposed in a civil contempt proceeding when it is clearly established that the alleged contemnor is unable to comply with the terms of the order."); *United States v. Rylander*, 460 U.S. 752, 757 (1983) (When a contemnor shows that it is impossible to comply with the court's order, "neither the moving party nor the court has any reason to proceed with the civil contempt action."). Shifting the burden of proving the contemnor's inability to comply with a court order does not violate due process. *Hicks*, 485 U.S. at 638; *Maggio v. Zeitz*, 333 U.S. 56, 75–76 (1948).

Additionally, the length of coercive incarceration, in and of itself, is not dispositive of its lawfulness. A court may jail a contemnor "indefinitely until he complies," *Bagwell*, 512 U.S. at 828, or until he establishes that compliance is no longer possible, *Rylander*, 460 U.S. at 757, 761; *Maggio*, 333 U.S. at 74; *see also Bagwell*, 512 U.S. at 828 (confining a contemnor "indefinitely until he complies with an affirmative command" is the "paradigmatic coercive, civil contempt sanction"). Even lengthy periods of confinement do not violate a contemnor's due process rights as long as the confinement remains coercive. *See*, *e.g.*, *Shillitani v. United States*, 384 U.S. 364, 371 n.8 (1966) (noting that grand jury witnesses who refused to answer jury's questions could be held in civil contempt until they complied with court order to do so, even if that term stretched into years, as long as grand jury or successor grand jury was sitting); *United States v. Harris*, 582 F.3d 512, 515–18 (3d Cir. 2009) (holding that 5-year civil confinement for contempt did not violate due process or become de facto criminal in nature); *Armstrong v. Guccione*, 470 F.3d 89, 110–12 (2d Cir. 2006) (holding that 7-year imprisonment for refusing to produce $15 million in

property did not violate contemnor's due process rights); *Chadwick v. Janecka*, 312 F.3d 597 (3d Cir. 2002) (reversing habeas court's order releasing a state petitioner from 7-year conditional confinement as there is no federal constitutional bar to petitioner's "indefinite confinement for civil contempt so long as he retains the ability to comply with the order"); *see also United States v. Rapower-3, LLC*, 470 F. Supp. 3d 1232, 1250 (D. Utah 2020) ("[T]he Johnsons have not complied with this Court's orders, and instead have gone out of their way to defy them. Other contemnors who demonstrated a similar lack of effort have remained incarcerated for years.") (collecting cases).

### B. Analysis

#### 1. Exhaustion

Robert argues that Ras's petition should be dismissed for failure to exhaust because he did not appeal his federal claims to the state's highest court, and, moreover, because he did not assert federal claims at all in his applications for release. DE 16-47 at 30. As to the latter argument, I disagree; Ras consistently argued to the state court that his confinement was punitive rather than coercive and that he therefore must be released. While perhaps not crystal clear, this is sufficient; it amounts to an assertion of a claim "in terms so particular as to call to mind a specific right protected by the Constitution," *Nara*, 488 F.3d at 198, *i.e.,* the constitutional right to due process. As recounted above, the Supreme Court has held that when incarceration for civil contempt becomes punitive, it violates a contemnor's right to due process. *See, e.g.*, *Hicks*, 485 U.S. at 638 n.9; *Rylander*, 460 U.S. at 757. Accordingly, Robert's argument that Ras failed to fairly present his federal due process claim in his applications to the trial court for release is rejected.

Ras concedes, however, that he did not exhaust his constitutional due process claim at every level of the state courts. He argues instead that exhaustion would have been futile because "the fluidity of the facts makes effective appellate review impossible," as "[a]ny record reviewed by any appellate court would be hopelessly out-of-date" by the time the court reviewed it. DE 19 at 13–14. Robert argues that exhaustion was feasible because New Jersey's court rules and case law provide several options to expedite an appeal or have the appellate court consider new information. DE 16-47 at 33. For example:

> Ras could have moved to accelerate the appeal he dismissed, which if granted may have resulted in a decision more quickly than this habeas petition. See R. 2:9-2 (providing that "the time schedule [fixed by the Rules for an appeal] may be accelerated on the court's own motion or on the motion of a party"). Ras could have moved for summary disposition of his appeal, without full merits briefing. See R. 2:8-3(b) ("Any party to an appeal may move the Appellate Division for summary disposition in accordance with R. 2:8-1(a)."). Or Ras could have moved to supplement the record before the Appellate Division (or Supreme Court) to seek to put new evidence directly before those courts. *See Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A.*, 189 N.J. 436, 452 (2007) ("we conclude that even though Rule 2:5-5 does not include an express provision for the supplementation of a trial court record, an appellate court has the inherent power to address such a motion"); *State v. Steele*, 420 N.J. Super. 129, 133 n.1 (App. Div. 2011) (granting postargument motion to supplement the record).

DE 16-47 at 33. In response, Ras argues only that "supplementation of the record is discretionary and not guaranteed." DE 19 at 14 (citing *Liberty Surplus Ins. Co. v. Nowell Amoroso, P.A.*, 189 N.J. 436, 452 (2007)).

Ras's conclusory assertion that "the fast-changing facts of this case" make the state court appellate process ineffective is an insufficient basis upon which to excuse exhaustion, and his speculation that a reviewing court may reject his request to supplement the record is just that— speculation. It is entirely possible that the state appellate courts would have, upon request, expedited the appeal, granted an application to supplement the record, or otherwise considered

the merits of Ras's claims, particularly because his freedom is at stake. As such, I find that his

claims are unexhausted, and that exhaustion would not necessarily have been futile.[8]

Nevertheless, as permitted by § 2254(b)(2), I will in the alternative deny Ras's due

process claim on the merits. *See Carrascosa v. McGuire*, 520 F.3d 249, 255 (3d Cir. 2008) ("The

District Court was . . . well within its discretion to deny Carrascosa's unexhausted claim [based

on her incarceration for civil contempt] on the merits"); *Taylor v. Horn*, 504 F.3d 416, 427 (3d

Cir. 2007) ("[B]ecause we will deny all . . . claims on the merits, we need not address

exhaustion."); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005) ("[W]e may reject claims on

the merits even though they were not properly exhausted, and we take that approach here.");

*Lambert v. Blackwell*, 387 F.3d 210, 260 n.42 (3d Cir.2004) (addressing an unexhausted claim

"because it is meritless and we can therefore dismiss it under 28 U.S.C. § 2254(b)(2)") (citation

omitted).

### 2. Merits

Ras contends that his continued confinement has become punitive and is therefore

objectively unreasonable under the Fifth and Fourteenth Amendments. DE 1-1 at 12. At the

outset, he acknowledges his "misstatement"—an understatement if ever this Court has heard

one—regarding the uncovered UniCredit Bank account:

> Ras has few friends in the New Jersey state courts. And unfortunately, his
> reputation is well-earned. He has lied to the courts, including the recent
> misstatement that he had no assets to pay Robert beyond those identified in the
> Connecticut divorce proceedings when he all along maintained a UniCredit Bank
> account holding $2 million.

---

[8]     Nor does Ras explain why review by this Court would not be equally impaired, or why he is entitled to
invoke a "fast-changing" record whose volatility reflects, to a large degree, his own evolving representations about
his assets.

DE 1-1 at 17–18; *see also id.* at 12 (Ras's opening brief: "Ras certified that he did not have control over the $3 million he sent overseas in August 2016, and that outside the marital assets, he had no other assets to satisfy the judgment. Unfortunately, those representations were not true.") (citation omitted). He argues that the trial court's anger with him for lying is the predicate for his continued detention, and asserts that the court's "anger blinded [it] to the undisputed factual record, which shows that Ras has no assets beyond those identified in the Connecticut divorce proceedings." *Id.* at 18. For support, Ras points to his testimony at the February 2023 hearing that (1) beyond the UniCredit Bank account and the assets identified in Connecticut, "he has nothing more" and (2) "[n]early all of the money he made from Koger—approximately $25 million—was spent on his homes, their renovation, and other significant family expenses." *Id.* at 19. He asserts that "[y]ears of digging by Robert has yielded nothing more – no hidden bank account, no additional property," yet the trial court "nevertheless found that Ras 'is lying to the Court once again,' that he must have other assets, and continued to incarcerate him to coerce the release of those phantom assets." Ras contends that this amounts to "an objectively unreasonable application of federal law." *Id.* at 20 (quotations omitted).

Ras further argues that the trial court "seems to believe it can incarcerate Ras to coerce George"—who, Ras claims, is paying his attorney's fees—and that this, too, is an objectively unreasonable application of federal law. *Id.* at 20-21.

Finally, Ras argues that there is nothing left to coerce because the Connecticut assets will satisfy the judgment. Ras represents that an offer has been accepted on the Connecticut home, and the money from that sale, along with the money from the investment accounts, and George's funds that Robert has frozen in Slovakia, is more than enough to satisfy the approximately $6 million outstanding on the judgment. *Id.* at 21–22.

Robert responds that the state court's application of federal law was not objectively unreasonable because the state court's finding that Ras failed to meet his burden of showing that he was not able to comply with the subject order "was made based on credibility and factual findings, which this [C]ourt must defer to, including, that Ras's renewed application was solely based on a certification claiming he had no assets, which was proven false while that application was pending, and incredible testimony from Ras unsupported by any financial documentation such as bank account records." DE 16-47 at 40. Robert contends that Ras's "failure to corroborate his testimony with any verifiable documentary evidence, including before this Court, lends to the conclusion that he still has assets available." *Id.* at 41.

Robert also argues that the trial court did not unreasonably apply federal law by "concluding that payment of Ras's fees suggests he has the ability to pay" because, if "Ras's claim is true that George is paying his attorneys with the monies sent overseas, that only supports a further finding of contempt because Ras is knowingly using funds to pay attorneys that have been court-ordered to be returned to pay the [j]udgment." *Id*. (citation omitted). Robert concludes "that structure"—George paying Ras's attorneys' fees—"suggests Ras and George remain in contempt, not that the [trial court] engaged in any objectively unreasonable application of federal law," and "Ras should not be released for his ongoing conspiracy and fraud on the [c]ourt." *Id.* (quotations omitted) (citing *Marshak v. Treadwell*, 595 F.3d 478, 486–87 (3d Cir. 2009) ("Non-parties guilty of aiding or abetting or acting in concert with a named defendant or his privy in violating the injunction may be held in contempt.") (cleaned up)). Thus, "[n]ot only does returning monies to pay attorneys violate the commitment orders, it violates the constructive trust that was imposed over George and Ras's assets on February 13, 2017." DE 16-47 at 42 (citing DE 16-46 (order lifting stay and forfeiting security)).

Robert further contends that Ras's argument that Robert is "guaranteed" payment in full "is fanciful" because "no payments have ever been made by Ras voluntarily" and "there is no 'guarantee' of payment." DE 16-47 at 42–43. Specifically, Robert asserts that "[n]o money has ever been paid to Robert for the 'credits' that Ras suggests have been applied to the [j]udgment for the investment accounts, Connecticut house, and George's funds overseas," and, to the contrary, "Ras is actively engaged in efforts in Connecticut and Slovakia to prevent those 'credits' from ever happening." *Id.*

Ras responds that the trial court unreasonably applied clearly established federal law in continuing his confinement because (1) "[t]here is absolutely no evidence in the record that Ras has any other asset not disclosed to the court"; (2) the judgment "is secured and on an inevitable glide path to payment in full," and is therefore "as good as paid"; (3) "there is nothing Ras can do (or not do) to speed payment of the judgment"; and (4) the court is "punishing Ras for his persistent bad behavior"; however, Ras "can only be held to coerce his payment of the judgment," not "because he secreted funds overseas, or lied to the Superior Court, or used obstructionist tactics." DE 19 at 10, 13.

I find that the state court reasonably determined that Ras's confinement is coercive and not punitive. The court made well-supported factual findings that Ras failed to establish that he cannot bring back the secreted funds, and rejected of Ras's testimony that he has no additional undisclosed assets, based in part on credibility determinations.[9] I must defer to such findings,

---

[9] *See, e.g.*, DE 16-5 at 6 ("I think there should be an opportunity to bring that money back by coercive means and at least part of that money that [Ras] willfully sent out of the country. . . . It's a lot of money we're talking about. And it was sent to family and it could be retrieved from family."); DE 16-20 at 8 ("I'm not convinced that the money can't be brought back. The money doesn't want to be brought back. He spent millions of dollars in fees. I mean, do you want to give me a certification as to how much all of this has cost? And then, you know, and then of course it will be it didn't come from him, but you know, if it's on his behalf, then he has the ability to access funds."); *id.* at 23 ("I'm having trouble believing that you have access to all these funds, but not when it comes to satisfying this judgment. So I think the

absent clear and convincing evidence to the contrary. *See Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (28 U.S.C. § 2254(d) "gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor was observed by the [factfinder], but not by them."). Here, Ras has not provided clear and convincing evidence to the contrary. He has provided only unsupported representations, including that he has no additional undisclosed assets; his father is paying his attorneys' fees; and he has no control over the assets he secreted overseas.

Further, there is strong support for the state court's finding that Ras was not credible. To begin, he, among other bad faith conduct, secreted funds overseas beginning the day after the judgment was awarded, encumbered the assets he posted for security to stay enforcement of the judgment, and admittedly lied to the courts—in both a certification made under penalty of perjury and via representations of counsel—about his assets and his ability to bring the secreted funds back from overseas. *Sipko*, 251 N.J. at 173–76; DE 16-20 at 8–9, 11; DE 16-25; DE 16-27 at 2. The state court is obviously permitted to consider Ras's previous bad faith conduct and lies when considering his credibility going forward. *See, e.g., Gillimas v. United States*, No. 09-1118, 2011 WL 3648265, at *5 (E.D. Mo. Aug. 18, 2011) ("the Court finds Movant's testimony during the hearing was not credible, especially in light of his admission that he had lied to this Court in

---

money can come back."); DE 2-25 at 107 ("So this application is filed, briefs are submitted, and an account is discovered that he lied about. But now there are no other accounts. Well, you know what? I am not so sure about that."); *id.* at 108 ("I don't know if there are any other accounts, but I guess that has to be looked into. But the point, is, once again, an application was brought before this Court for [Ras] to get out of jail, and it was just one big lie about, I have no assets."); *id.* ("Did he say that to the Court or not? Did you submit papers to this Court that he has no asserts? Well, he lied. So now I am supposed to believe that he has no assets when I am sure George is paying you, he paid millions of dollars to other attorneys, and my concern, is, this is coercive. . . . And I don't believe any of it at this point."); DE 2-28 at 40 ("And then we have George lurking out there. Somebody is paying all these fees. Either he is paying them and he has money, or somebody else is paying them. If you want to make a fuller picture, if you want to disclose all that, you want to – but, you know, the Court is in the dark. So I am just supposed to believe this is it, he has no more money. But you know what? I don't believe it. So it is coercive. He did [perjure] himself."); *id.* at 41 ("I am glad there seems to be some movement, but, you know, let him bring something back. And I said – and it you're saying he doesn't have it, then, you know, I am not prepared at this point to accept that.").

the past"); *S.E.C. v. First City Fin. Corp.*, 890 F.2d 1215, 1233 (D.C. Cir. 1989) (concurrence) (noting the "unproblematic conclusion that professions of future compliance are not credible when proffered by persons who have deliberately broken the law and lied to the court in the past"). And it also appears that as of the filing of his reply submission he still had not produced bank statements from the Slovakian bank account (which may or may not reveal the transfer of additional funds), or provided other financial documentation in support of his assertions that he has fully disclosed his financial status. DE 19 at 19; DE 19-1 at 19.

Moreover, someone—it is not clear who—is presumably paying Ras's numerous attorneys, a circumstance which supports the state court's finding that Ras may have some control over, or access to, additional funds overseas. As to Ras's recent representation through counsel that George is paying his fees, as noted above, he provides no support, and in fact he seems to have previously represented that someone else was paying his fees. DE 16-20 at 11 (counsel for Ras: "And I know your honor has always commented on the legal fees. And I know the optics of that. . . . and those optics are bad. . . . But, again, if he actually had the ability to borrow the $3 million from his mother or from any other source from [w]here the attorneys' fees are coming from, again, what reasonable person who holds that key in their pocket to get out of jail, wouldn't do it if they had the ability to and not incur the kind of loss that he incurred, and not continue to have to remain behind bars like he currently is?"); 14 (Court: "[W]ho is paying [Ras's] fees?" Counsel: "His mother."). In any event, recall that George, who became a fugitive, was found jointly liable with Ras for the amount owed to Robert; if George is paying the attorneys, a legitimate inference arises that the money going to attorneys to contest Ras's incarceration for civil contempt should have instead been used to satisfy the judgment. Thus,

these equivocal and unsupported representations about payment of fees do not change the analysis.

Finally, the trial court reasonably rejected Ras's argument that his confinement is punitive because the proceeds of the Connecticut proceeding, including from the sale of the Connecticut property, "will" satisfy the judgment. On this record, it appears the assets remain encumbered and subject to challenge in the Connecticut courts. DE 16-35; DE 16-36; *see also* DE 16-20 at 24 ("So, you know, again Connecticut is an offshoot and the Appellate Division said we could consider parts of that . . . . Maybe you'll be successful on your appeal. There will be a whole new trial [in Connecticut] . . . . [W]e don't know what's going to happen, but you know, and it's -- then that's kind of off the table and we've got to go back to bring the money back. . . . [S]o I'm going to deny it and at the appropriate time, certainly I'll be happy to reconsider it."). "As good as paid" is not "paid." The trial court reasonably concluded that there is no reliable guarantee of full satisfaction of the judgment from those encumbered assets.

In short, the trial court's determination that Ras's continued confinement is coercive— based on its findings that Ras was not credible and failed to establish that he cannot bring back the secreted funds—is supported by the record. Thus, Ras has failed to establish that the state court's rejection of his claim was contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented. Accordingly, habeas relief on this claim will be denied.

## V.      CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability ("COA"), an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a

substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Here, reasonable jurists would not find the Court's habeas ruling debatable. Accordingly, no certificate of appealability shall issue.

## VI.    CONCLUSION

For the foregoing reasons, Ras's petition is denied and no certificate of appealability shall issue.  An appropriate order follows.

DATED:  October 10, 2023

/s/ Kevin McNulty
_____
KEVIN MCNULTY
United States District Judge